Neil A. VANDER LINDEN; Forrest E. Ott; Ann Y. Hart; Peggy A. Dufek; Vincent Johnson; Alice J. Cicenia; Gwendolyn L. Grooms; Robert H. Waters; Anita L. Franklin, Plaintiffs–Appellants,

and

Bufort Blanton, Plaintiff,

v.

James H. HODGES, Governor, in his capacity as Governor of South Carolina; David H. Wilkins, in his official capacity as Speaker of the South Carolina House of Representatives; Dorchester County Legislative Delegation; George H. Bailey, in his representative capacity as a member of the State House of Representatives; the South Carolina Senate; Defendant Class; South Carolina House of Representatives; John Doe, Chair of the Dorchester County Legislative Delegation; Bill Branton, Senator; Converse A. Chellis, III, Representative; Robert W. Harrell, Jr., Representative;

Gilda Cobb–Hunter, Representative; Annette Young–Brickell, Representative, Defendants–Appellees,

and

Nick Theodore, in his official capacity as Lieutenant Governor and presiding officer of the South Carolina Senate; Robert J. Sheheen, in his official capacity as Speaker of the South Carolina House of Representatives; James B. Ellisor, in his offical capacity as Executive Director of the South Carolina State Election Commission; State of South Carolina, Defendants.

UNITED STATES of America, Amicus Curiae.

No. 98–2174.

United States Court of Appeals, Fourth Circuit.

Argued April 7, 1999.

Decided Sept. 30, 1999.

See also, 99 F.3d 134.

**ARGUED:** Moffatt Laughlin McDonald, American Civil Liberties Union Foundation, Inc., Atlanta, Georgia, for Appellants. David Reece Williams, III, Columbia, South Carolina; James Emory Smith, Jr.,

Columbia, South Carolina; Thomas Stuart White, Charleston, South Carolina, for Appellees. **ON BRIEF:** Neil Bradley, Maha Zaki, Cristina Correia, American Civil Liberties Union Foundation, Inc., Atlanta, Georgia; Herbert E. Buhl, III, Columbia, South Carolina, for Appellants. Paula Gail Benson, Columbia, South Carolina, for Appellee Senate; Charles Molony Condon, Columbia, South Carolina, for Appellees Wilkins and House; Samuel W. Howell, IV, Charleston, South Carolina, for Appellees Legislative Delegation and Doe; Charles F. Reid, Columbia, South Carolina, for Appellee Speaker; Charles E. Carpenter, Jr., Columbia, South Carolina, for Appellee Beasley.

Before NIEMEYER, MICHAEL, and MOTZ, Circuit Judges.

Reversed and remanded by published opinion. Judge MOTZ wrote the majority opinion, in which Judge MICHAEL joined. Judge NIEMEYER wrote a dissenting opinion.

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

In this case we consider the legality of South Carolina's county legislative delegation system. The district court upheld this system in the face of constitutional and statutory challenges. Because county legislative delegations constitute elected governmental bodies to which the constitutionally mandated "one person, one vote" requirement applies, we reverse and remand for further proceedings.

### I.

Except as noted, the district court found or the parties stipulated to the following facts.

Persons residing and voting in various South Carolina counties (collectively, the voters) brought this action on behalf of themselves and all others similarly situated against the Governor of South Carolina, the South Carolina legislature, the Speaker of the House, and other state officials (collectively, the State). The voters assert that the State's legislative delegation system violates the United States Constitution, the Voting Rights Act of 1965, 42 U.S.C.A. § 1973 (West 1994), and the Civil Rights Act of 1957, *id.* § 1971(a).

Legislative delegations have played a critical role in the governance of South Carolina counties for more than a century. As the district court noted, "for generations legislative delegations of the General Assembly controlled virtually every aspect of local government." Both parties' experts testified that the legislative delegation system took shape at the end of the 19th century, after a constitutional amendment in 1890 removed local government from the hands of locally elected officials. The experts agreed that the system of locally elected county government was rejected partly because it had resulted in the election of large numbers of African–American officials.

The voters' expert testified that the legislative delegation system, which developed in place of locally elected county government, was similarly created out of fear of African–American voting power. Even the State's expert conceded that fear of the demands of emancipated slaves was one factor that led to the creation of the legislative delegation system. Moreover, the experts agreed that the legislative delegation system arose against the backdrop of a white supremacist movement, led by Governor Ben Tillman, that sought to diminish African–American voting power. This effort, the experts further explained, led to the effective disfranchisement of the African–American population through the adoption of the South Carolina Constitution of 1895.

By 1900, county government had come to be controlled by the General Assembly. Under this system, the residents of each county elected one senator and, depending on the county's population, one or more

representatives to the General Assembly. The legislators thus elected from each county constituted the county's legislative delegation. In practice, local legislation was formulated by the legislative delegation for the relevant county and then enacted by the General Assembly at large with no scrutiny. *See Duncan v. County of York,* 267 S.C. 327, 228 S.E.2d 92, 95 (1976). As the district court explained, "in addition to being state legislators, members of the Senate and House were effectively the county legislature and governing board."

The structure of county legislative delegations in South Carolina remained unchanged until legislative districts were redrawn following establishment of the one person, one vote rule in 1964. *See Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). This redistricting produced legislative districts that sometimes crossed county lines. As a result, "the complexion of the legislative delegation changed," the district court noted, "such that there was no longer a county-oriented legislative delegation elected by the voters of an entire county and answerable to the people of that county."

Instead, redistricting created a situation in which South Carolina legislators are elected from districts that contain parts of more than one county. Upon election to the General Assembly, each legislator automatically becomes a member of the legislative delegation of *every* county containing territory that falls within the legislator's district. Generally, each member of a delegation has one vote in delegation decisions regardless of the number of constituents that he or she has in the county. The voters presented uncontroverted evidence that some legislators are members of the legislative delegation of a county in which they have relatively few constituents, and that some

are even members of delegations for counties in which they have no constituents at all.

In 1973, South Carolina amended its Constitution in order to vest much of the power over county affairs in locally elected county officials. But county legislative delegations still retain statutory authority over certain aspects of local government. Indeed, the parties stipulated that "County Legislative Delegations perform numerous and various general county governmental functions prescribed by state law."[1] They further stipulated that these "numerous" and "general county and governmental functions" include:

(a) making and/or recommending appointments to boards and commissions;

(b) approving and/or recommending the expenditure of money allocated by the South Carolina General Assembly for highways, parks, recreation, tourism, and other matters;

(c) approving the budgets of local school districts;

(d) initiating referenda regarding the budgetary powers and the election of governing bodies for a special purpose in public service districts;

(e) approving the reimbursement of expenses for county planning commissioners;

(f) approving county planning commission contracts with architects, engineers, and other consultants;

(g) altering or dividing school districts of counties;

(h) reducing existing special school levies in counties and school districts;

(i) submitting grant applications for planning, development and renovating park and recreation facilities.

---

1. Although Defendants South Carolina House of Representatives and House Speaker David H. Wilkins did not stipulate to the phrase "and various general county governmental," they did agree to the accuracy of the facts set forth in the stipulations, i.e. that the delegations actually "perform numerous ... functions prescribed by state law," including the nine specifically described powers set forth above. *See* J.A. 184.

In 1991, the voters filed this action challenging the county legislative delegation system. The district court stayed the case to permit the General Assembly to fashion an appropriate alternative to the present system. When the General Assembly failed to come up with any alternative, the district court reactivated the case.

The voters maintain that because each member of a county legislative delegation has one vote regardless of how many of the member's constituents live in the county, the delegation system dilutes the voting power of county residents from more populous areas. The system, according to the voters, thus violates the one person, one vote requirement that the Supreme Court has held derives from the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *See Reynolds,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506; U.S. Const. amend. XIV § 1. The voters also argue that the delegation system discriminates against African–Americans in purpose and effect in contravention of the Constitution, the Voting Rights Act of 1965, and the Civil Rights Act of 1957.

After a bench trial, the district court rejected both contentions. Because we conclude that the county legislative delegation system violates the constitutionally mandated one person, one vote requirement, we must reverse. In view of this holding, we need not reach the voters' alternative claim as to the asserted racially discriminatory purpose and effect of the delegation system.

## II.

■ The Supreme Court has concluded that "the Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." *Reynolds,* 377 U.S. at 577, 84 S.Ct. 1362.[2]

■ The Court has since extended this one person, one vote requirement to local government, yielding the "general rule" that

whenever a state or local government decides to select persons by popular election to perform governmental functions, the Equal Protection Clause of the Fourteenth Amendment requires that each qualified voter must be given an equal opportunity to participate in that election, and when members of an elected body are chosen from separate districts, each district must be established on a basis that will insure, as far as is practicable, that equal numbers of voters can vote for proportionally equal numbers of officials.

*Hadley v. Junior College Dist. of Metro. Kansas City,* 397 U.S. 50, 56, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970).

■ In support of their one person, one vote claim, the voters here presented demographic reports showing that the delegation system deviates from the standard of equal, population-based representation set by the Supreme Court. The reports demonstrated that by one measure, 45 of the 46 legislative delegations in South Carolina deviate from the equal population standard by amounts that range from 75.15% to 330.56%, and that by another measure, 44 of the 46 delegations deviate from the standard by amounts that range from 34.86% to 418.47%. The State proffered no evidence that in any way contradicted these findings.

The Supreme Court has held that districts with a maximum deviation from equal population of 16.5% violate the one person, one vote mandate in the absence of

---

2. The State's contention that the political question doctrine totally precludes judicial consideration of this case cannot prevail in the face of *Reynolds, Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and their progeny. In those cases, the Supreme Court held that "if discrimination is sufficiently shown, the right to relief under the equal protection clause is not diminished by the fact that the discrimination relates to political rights." *Baker,* 369 U.S. at 209–10, 82 S.Ct. 691 (internal quotation marks omitted).

a compelling justification for the deviation. *Connor v. Finch,* 431 U.S. 407, 416–17, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977). The State offers no such justification—in fact no justification of any kind—for the deviations caused by the delegation system. Indeed, in light of the fact that some members of the county legislative delegations represent literally uninhabited territory in the counties they supposedly represent, it seems highly unlikely that any adequate justification for the current system could be provided.

Perhaps for this reason, the State does not maintain that the disparities between the populations represented by various delegation members are not great enough to violate the one person, one vote principle. Rather, it contends, and the district court held, that the one person, one vote principle does not apply to the county legislative delegations. The district court seems to have based this holding on two conclusions: (1) the legislative delegations are not selected "by popular election" and (2) the delegations do not "perform governmental functions." *Hadley,* 397 U.S. at 56, 90 S.Ct. 791. We consider each of these conclusions in turn.

### III.

■ In deciding that county legislative delegations are not popularly elected, the district court initially found that members of the delegations are appointed. The court then analogized this case to *Sailors v. Board of Educ.,* 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967), in which the Supreme Court held that the one person, one vote requirement did not apply to an appointed county school board exercising essentially administrative functions. *Id.* at 108, 110, 87 S.Ct. 1549.

In this case, however, the undisputed facts surrounding the selection of delegation members do not permit the conclusion that they are appointed officials. First, no appointment process leads to the designation of a legislator as a member of a legislative delegation. Second, the concept of an appointment presumes the existence of an appointing authority; nothing in the record even suggests that any official or body exercises the power to appoint members of the legislative delegations. Rather, the power to determine the membership of a legislative delegation resides in the electorate. It is thus clear, and the State essentially concedes on appeal, *see* Brief of Appellees at 10; Tape of Oral Argument (Apr. 7, 1999), that the district court's finding that members are appointed to the delegations constitutes error. In fact, individuals become delegation members not through appointment but rather simply by virtue of their popular election to the legislature. *Sailors,* therefore, is inapposite.

The district court did not, however, rely exclusively on *Sailors.* Rather, the court alternatively reasoned that the one person, one vote requirement does not apply to the county legislative delegation system because delegation members "are not elected to the delegations as that term is generally understood," in that they become delegation members automatically upon their election to the General Assembly. Delegation membership, the district court explained, is therefore simply "part of the job of being a member of the General Assembly."

The Supreme Court's decision in *Board of Estimate v. Morris,* 489 U.S. 688, 109 S.Ct. 1433, 103 L.Ed.2d 717 (1989), prohibits adoption of this rationale. In *Morris,* voters challenged the structure of the Board of Estimate of New York City. The Board's membership included the city's five borough presidents, each of whom was elected by the residents of his or her respective borough. The boroughs varied greatly in population, yet each had equal representation on the Board of Estimate. The voters claimed that the Board's structure therefore violated the one person, one vote requirement.

The district court in *Morris* rejected this claim. Following reasoning similar to

that of the district court in the case at hand, it held that the Board was not popularly elected because no independent election was held to select its members:

> The Board . . . is not an elected body: it consists of a group of public officials who are already constitutionally elected to their respective offices as required by law. . . . No provision is made in the Charter for the election of a board of estimate. Membership and participation in the assigned activities of the Board is simply a part of the prescribed duties of the respective offices to which the designated officials were already elected.

*Morris v. Board of Estimate*, 551 F.Supp. 652, 656 (E.D.N.Y.1982).

The Supreme Court decisively repudiated this rationale.[3] The *Morris* Court recognized that members of the Board of Estimate are not independently elected to the Board, noting instead that they "become members as a matter of law upon their various elections" to other offices. *Morris*, 489 U.S. at 694, 109 S.Ct. 1433. Nonetheless, the Court held that the Board itself constituted a popularly elected body to which the one person, one vote

requirement applied. Indeed, the nearly unanimous *Morris* Court held this result "certain." *Id.* ("That the members of New York City's Board of Estimate trigger this constitutional safeguard is certain.").

Members of South Carolina's legislative delegations, like members of the Board of Estimate in *Morris,* are popularly elected to other offices and, in the same way that the officials in *Morris* became Board members, become delegation members as a matter of law "upon their various elections." *Id.* For this reason, we can only conclude that legislative delegation members, like the Board of Estimate members in *Morris,* are popularly elected for purposes of the one person, one vote requirement.

## IV.

■ Without expressly acknowledging that *Morris* foreclosed any contention that the legislative delegations are not popularly elected bodies, the district court attempted to distinguish *Morris* on the ground that "the body in question in that case exercised broad governmental powers

---

3. In arguing its position, the city urged the Supreme Court to employ the Banzhaf Index, a mathematical formula used "to determine an individual voter's power to affect the outcome of a board vote." *Morris*, 489 U.S. at 697, 109 S.Ct. 1433. The Court flatly rejected resort to such a device, finding that it "did not reflect the way the board actually works," but rather was a "theoretical explanation of each board member's power to affect the outcome of board actions." *Id.* at 699, 109 S.Ct. 1433. The Court concluded that the "population based approach of [its] cases from *Reynolds* [377 U.S. at 577, 84 S.Ct. 1362] through *Abate [v. Mundt*, 403 U.S. 182, 185, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971),]" constituted the proper approach. *Id.* at 698, 109 S.Ct. 1433. The Court explained that although the "equal protection approach reflected" in *Reynolds* might not be perfect, "it does assure that legislators will be elected by, and represent citizens in, districts of substantially equal size" and *"does not attempt to inquire whether, in terms of how the legislature actually works in practice, the districts have equal power to affect a legislative outcome. This would be a difficult and everchanging task, and*

*its challenge is hardly met by a mathematical calculation that itself stops short of examining the actual day-to-day operations of the legislative body."* *Morris*, 489 U.S. at 699, 109 S.Ct. 1433 (emphasis added).

The State and the district court in this case quote the emphasized language from *Morris* out of context to support their view that application of the *Reynolds* one person, one vote approach to the legislative delegations would require an inquiry into "how the legislature actually works in practice." In fact, as noted above, the Supreme Court in *Morris* expressly held that, whatever its faults, the "equal protection approach reflected in *Reynolds* " did *"not* " even "attempt" to do this. *Id.* (emphasis added). Moreover, the *Morris* Court's concern about judicial inquiry into how the legislature actually works in practice was directed at prohibiting courts from deciding vote dilution cases based on whether a particular group has the power to affect legislative outcomes. We engage in no such outcome-based analysis here; instead we rely entirely upon the population-based approach of *Reynolds* that the *Morris* Court expressly approved. See *id.*

whereas delegations exercise only limited functions."

Focusing on whether the delegations exercise governmental functions seems to us entirely appropriate. After all, in *Hadley* the Supreme Court held that the one person, one vote rule applies "whenever a state or local government decides to select persons by popular election to ·perform *governmental functions.*" 397 U.S. at 56, 90 S.Ct. 791 (emphasis added). Surely it is fair to infer from this statement that the one person, one vote rule does not apply to the election of officials who do *not* "perform governmental functions." Thus the remaining question before us is: do the delegations perform governmental functions?

As we have noted, *supra* at 277, the parties *stipulated* that county legislative delegations "perform numerous and various general county governmental functions." In these stipulations they list nine different sorts of governmental power exercised by the delegations, including numerous fiscal and regulatory powers. These stipulations would seem to resolve the question of whether the delegations perform governmental functions: the State has conceded that they do.

The district court, however, rejected this conclusion. The court noted that "[t]he South Carolina Supreme Court has narrowed the functions of delegations when [state] constitutional challenges have been made concerning separation of power." The court relied on *Thomas v. Cooper River Park & Playground Comm'n*, 322 S.C. 32, 471 S.E.2d 170, 171 n. 1 (1996) (statute enabling delegation to approve public service district tax and budget violates separation of powers provision in state constitution); *Tucker v. South Carolina Dep't of Highways & Pub. Transp.*, 309 S.C. 395, 424 S.E.2d 468, 469 (1992) (statute empowering delegation to approve expenditure of certain road construction funds violates separation of powers provision in state constitution); *Gunter v. Blanton*, 259 S.C. 436, 192 S.E.2d 473, 475 (1972) (statute empowering delegation to approve increase in school tax levy violates separation of powers provision in state constitution); *Gould v. Barton*, 256 S.C. 175, 181 S.E.2d 662, 673–74 (1971) (separation of powers provision in state constitution permits legislative delegation to appoint members of parks commission, but does not permit delegation to approve commission's budget); and *Spartanburg County v. Miller*, 135 S.C. 348, 132 S.E. 673, 676–77 (1924) (delegations may, consistent with separation of powers clause of state constitution, be vested with power to collect information). The district court seemed to believe that these cases required it to consider the delegations' powers to be limited to the power to make appointments, the power to make nonbinding recommendations, and the power to receive information. The State suggests that these powers do not qualify as governmental functions within the meaning of *Hadley*, and contends that if the delegations exercise powers beyond these "then the matter is one of state law" that should be left to the state courts.

Even if we were to consider the delegations' powers to consist ·only of those approved by the South Carolina Supreme Court, however, we could not conclude that the delegations fail to exercise governmental functions. South Carolina law clearly regards one of these powers, the making of appointments, as a governmental function. *See Crow v. McAlpine*, 277 S.C. 240, 285 S.E.2d 355, 357 (1981) (function of making appointments may "be performed by any of the three branches of government"). Moreover, the United States Constitution and the constitution of every state grant appointment powers to various officials and bodies.[4] It cannot seriously be

4. *See e.g.,* U.S. Const. art. II, § 2, cl. 2; Ala. Const. art. XV, § 276; Alaska Const. art. III, § 19; Ariz. Const. art. V, § 12; Ark. Const. art. 6, § 22; Cal. Const. art. III, § 8; Col. Const. art. IV, § 23; Conn. Const. art. 4th, § 27; Del. Const. art. III, § 9; Fla. Const.

contended that the power to appoint governmental officials fails to qualify generically as a governmental function.

More fundamentally, though, the validity or invalidity of the delegations' powers under state law is simply irrelevant; it is well established that equal protection review of a state practice is unaffected by the legality of the practice under state law. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (involvement of state official in racially discriminatory conspiracy provides state action necessary to show violation of Equal Protection Clause "whether or not the actions of the [official] were officially authorized, or lawful"); *Snowden v. Hughes*, 321 U.S. 1, 11, 64 S.Ct. 397, 88 L.Ed. 497 (1944) (legality of action under state law irrelevant to whether it violates federal Equal Protection Clause); *see also Home Tel. & Tel. v. City of Los Angeles*, 227 U.S. 278, 287, 33 S.Ct. 312, 57 L.Ed. 510 (1913) (inquiry concerning whether state has authorized action of state official violating Fourteenth Amendment "is irrelevant"). As the Supreme Court has explained, the illegality of a state action under state law "can neither add to nor subtract from its [federal] constitutional validity." *Snowden*, 321 U.S. at 11, 64 S.Ct. 397. Indeed, in *Reynolds* itself, the plaintiffs complained that the Alabama legislature had not been reapportioned for over sixty years in contravention of a provision in the Alabama Constitution requiring reapportionment every ten years. 377 U.S. at 540, 84 S.Ct. 1362. The fact that the challenged apportionment scheme stood in violation of the state constitution did not prevent the Supreme Court from striking it down as violative of the federal Equal Protection Clause. *See id.* at 584, 84 S.Ct. 1362.

In evaluating the voters' equal protection claim, therefore, we must consider the powers presently *exercised* by the delegations without regard to whether those powers have been or would be ruled unconstitutional by the state supreme court. As noted above, the parties have stipulated that the delegations actually "perform numerous and various general county governmental functions," including approving or recommending expenditures for various activities, approving local school district budgets, initiating referenda regarding special-purpose governing bodies in public service districts, approving reimbursement of expenses for county planning commissioners, approving county planning commission contracts, altering or dividing county school districts, reducing special school levies, submitting grant applications for park and recreation facilities, and making or recommending appointments.

Although the stipulations do not cite the particular statutes that provide the sources of the specified powers, examination of the South Carolina Code reveals statutes giving the delegations precisely the powers described. Specifically, these statutes grant the delegations (1) the power to approve the payment of funds distributed to counties containing state forest lands, S.C.Code Ann. § 48–23–260 (Law. Coop.1987); (2) the power to approve refunds of state gasoline taxes, *id.* §§ 12–27–

art. IV, § 6; Ga. Const. art. IV, § 2, para. I; Haw. Const. art. V, § 6; Idaho Const. art. IV, § 6; Ill. Const. art. V, § 9; Ind. Const. art. 5, § 18; Iowa Const. art. V, § 16; Kan. Const. art. 1, § 11; Ky. Const. § 152; La. Const. art. IV, § 5; Me. Const. art. V, part 1, § 8; Md. Const. art. II, § 10; Mass. Const. part 2, ch. 2, § 1, Art. 11; Mich. Const. art. V, § 3; Minn. Const. art. V, § 3; Miss. Const. art. 4, § 103; Mo. Const. art. IV, § 22; Mont. Const. art. VI, § 8; Neb. Const. art. IV, § 1; Nev. Const. art. 4, § 12; N.H. Const. part 2, art. 46; N.J. Const. art. V, § 1, para. 12; N.M. Const. art. V, § 5; N.Y. Const. art. V, § 4; N.C. Const. art. 3, § 5; N.D. Const. art. V, § 8; Ohio Const. art. IV, § 5; Okla. Const. art. VI, § 1; Or. Const. art. X, § 3; Pa. Const. art. IV, § 8; R.I. Const. art. IV, § 4; S.C. Const. art. XI, § 1; S.D. Const. art. IV, § 9; Tenn. Const. art. III, § 17; Tex. Const. art. III, § 24a; Utah Const. art. II, § 5; Vt. Const. ch. II, § 21; Va. Const. art. V, § 10; Wash. Const. art. III, § 13; W. Va. Const. art. VII, § 8; Wis. Const. art. VI, § 4; Wyo. Const. art. 4, § 7.

390, 12–28–2730 (Law. Coop.1998); (3) the power to obtain the release of infectious waste contingency funds, *id.* § 44–93–170; (4) the power to approve the budgets of certain educational com-missions, *id.* §§ 59–53–440, 59–53–550 (Law. Coop.1990 & Supp.1998); (5) the power to initiate a referendum to determine the budgetary powers and election of the governing bodies of special purpose and public service districts, *id.* § 4–11–265 (Law. Coop.1986); (6) the power to approve the alteration or division of school districts, *id.* § 59–17–20 (Law. Coop.1990); and (7) the power to approve the reduction of certain school tax levies, *id.* § 59–73–110 (Law. Coop.1990). The delegations are also vested with the power to directly appoint numerous governmental officials, including state board of education members, S.C. Const. art. XI, § 1; transportation committee members, S.C.Code Ann. § 12–28–2740 (Law. Coop. Supp.1998); and trustees of public hospitals, *id.* § 44–7–670 (Law. Coop.1985).[5]

In considering the delegations' powers to be confined within the state constitutional boundaries delineated by the state supreme court, the district court ignored both the express stipulations of the parties and the numerous statutes cited above. Moreover, the court did *not* find that the legislative delegations have in practice observed the limits set by the state supreme court. And indeed, nothing in the record suggests that the delegations have limited their activities in this manner. Rather, the undisputed record evidence shows that legislative delegations "*perform* numerous and various general county governmental functions," including some that may well be beyond their authority under the state constitution. For example, the delegations regularly approve particular local agency budgets pursuant to statute, despite South Carolina Supreme Court rulings striking down two statutes that gave similar budget-approval powers to certain delegations. *See Thomas,* 471 S.E.2d at 171 n. 1; *Gould,* 181 S.E.2d at 674. Thus, for purposes of equal protection review we must regard the undisputed record evidence (including most notably the parties' stipulations) and the state statutes currently on the books, rather than court rulings invalidating a handful of other statutes, to be determinative of the powers exercised by the legislative delegations.

Given the array of state statutes empowering the delegations to perform fiscal, regulatory, and appointive functions and the parties' stipulation that the delegations

---

5. South Carolina law also provides the delegations with numerous fiscal and regulatory powers not referenced in the stipulations. These include: (1) the power to direct the levy of taxes for the benefit of county hospitals, *id.* § 44–7–1100 (Law. Coop. Supp.1985); (2) the power to approve the issuance of general obligation bonds by the governing authority of regional airport districts, *id.* § 55–17–20 (Law. Coop.1992); (3) the power to waive penalties for a taxpayer's failure to make the required annual statement listing real and personal property, *id.* § 12–37–900 (Law. Coop.1977); (4) the power to approve the borrowing of funds by a regional higher education commission, *id.* § 59–57–40; (5) the power to approve the acquisition of real property through the Heritage Trust Program, *id.* § 51–17–140 (Law. Coop. Supp.1998); (6) the power to create county and regional housing authorities, *id.* §§ 31–3–720, 31–3–910 (Law. Coop.1991); (7) the power to permit abolition of special police districts, *id.* § 23–27–110 (Law. Coop.1989); (8) the power to approve the conditions for public use of lakes and ponds, *id.* § 50–13–2020 (Law. Coop. Supp. 1998), to approve the licensing of new hunting preserves, *id.* § 50–11–1210, to regulate the use of certain animal traps, *id.* § 50–11–2410, and to direct a closed season on fish for sixty days, *id.* § 50–13–60; (9) the power to approve certain new or amended fishing regulations, *id.* §§ 50–19–2230, 50–19–2520, 50–19–2630; (10) the power to authorize a county to abandon its free or rental textbook system, *id.* § 59–31–270 (Law. Coop.1990); and (11) the power to approve the use of vote recorders, *id.* § 7–13–1310 (Law. Coop.1977), and polling places for voting precincts, *id.* §§ 7–7–30, 7–7–40, 7–7–55, 7–7–80, 7–7–100, 7–7–110, 7–7–120, 7–7–170, 7–7–210, 7–7–250, 7–7–270, 7–7–340, 7–7–390, 7–7–410, 7–7–450, 7–7–480, 7–7–501, 7–7–520, 7–7–530 (Law. Coop. Supp.1998). While the record is silent as to whether delegations actually exercise any of these additional powers, we note that the list of powers in the stipulations of the parties does not purport to be exhaustive.

do "perform" such functions, we have little difficulty concluding that the legislative delegations exercise "governmental functions" and so fall within the scope of the one person, one vote mandate.

Finally, we note that, contrary to the district court's 'suggestion, the relative modesty of the delegations' powers in comparison to those of some other elected bodies does not render the delegations so unimportant that the one person, one vote rule should not be applied to them. The Supreme Court has specifically addressed, and rejected, such a contention:

> If the purpose of a particular election were to be the determining factor in deciding whether voters are entitled to equal voting power, courts would be faced with the difficult job of distinguishing between various elections. We cannot readily perceive judicially manageable standards to aid in such a task. It might be suggested that equal apportionment is required only in "important" elections, but good judgment and common sense tell us that what might be a vital election to one voter might well be routine to another. In some instances the election of a local sheriff may be far more important than the election of a United States Senator. If there is any way of determining the importance of choosing a particular governmental official, we think the decision of the State to select that official by popular vote is a strong enough indication that the choice is an important one.

*Hadley*, 397 U.S. at 55, 90 S.Ct. 791.

Thus the fact that the powers of the delegations are less extensive than, say, the enormous powers of the New York Board of Estimate is beside the point. *See Morris v. Board of Estimate*, 831 F.2d 384, 385 (2d Cir.1987), *aff'd*, 489 U.S. 688, 109 S.Ct. 1433, 103 L.Ed.2d 717 (1989). In view of the wide range of fiscal, regulatory, and appointive powers that the delegations exercise, the conclusion that the delegations are covered by the one person, one vote rule is inescapable.

### V.

Our good colleague in dissent acknowledges that members of legislative delegations are popularly "elected rather than appointed," *post* at 286, and does not dispute that the state defendants have stipulated that the legislative delegations perform nine different sorts of governmental powers. *See* J.A. 184–85, 431. Furthermore, the dissent apparently recognizes that the one person, one vote principle applies to popularly elected officials who exercise governmental functions. Yet our dissenting colleague would conclude that delegation members do not perform governmental functions and so "vigorously disagree[s]" with our holding that the one person, one vote principle applies to them. *Post* at 289. The tone of that disagreement requires a brief response.

South Carolina's express stipulation that the delegations do in fact perform a wide variety of budgetary, appointive, and other functions presents an unanswerable obstacle to our dissenting colleague's theory. The dissent does not attempt to surmount that obstacle by claiming that the detailed powers, which the state defendants have stipulated that the delegations perform, do not constitute governmental functions. Nor does the dissent maintain that the Governor, Senate, and House of Representatives of South Carolina were without authority to so stipulate, or that these state officers did not freely enter into the stipulations. Rather, the dissent attempts to avoid the impact of the stipulations by mischaracterizing them. Only by doing so can the dissent contend that our reliance on *facts* stipulated to by the State itself constitutes reliance on "hypotheticals" and "assumptions." *Post* at 283.

Our dissenting colleague maintains that the stipulations do not state the facts agreed to by the parties ("they are not facts at all"), but only "purported summaries of state statutes agreed to by some of the parties." *Post* at 284. Our colleague

misreads the stipulations. At the outset of the stipulations, *all* of the parties, by counsel, state that they:

> stipulate to the accuracy of the *following facts* and that they may be used in connection with plaintiffs' motion for class certification, motion for summary judgment, and for any other purpose in this litigation....

J.A. 182 (emphasis added). Although defendants South Carolina House of Representatives and Speaker Wilkins did not stipulate that the delegations' powers constitute "various general county governmental" powers, J.A. 184 n. 1, all defendants agreed that the legislative delegations actually "perform numerous... functions prescribed by state law." J.A. 184. Most importantly, all defendants stipulated that the functions presently performed by the legislative delegations include "approving ... the expenditures of money ...; approving the budgets of local school districts; ... approving the reimbursement of expenses ...;" and "reducing existing special school levies...." *Id.* The stipulations are not and do not purport to be "summaries of state statutes." *Post* at 284. Rather, the stipulations set forth the parties' agreement as to the powers actually exercised by members of the legislative delegations.

By stipulation, the parties in this case thus unmistakably agreed that the delegations perform a variety of functions beyond those authorized by the state's highest court—including approving the budgets,

expenditures, contracts, and reimbursements of certain governmental agencies. The State did not attempt to disprove these stipulated facts. Indeed, the district court expressly recognized that "[t]he parties herein have stipulated" that "[v]arious [c]ounty [l]egislative [d]elegations perform numerous ... functions prescribed by state law." *See* J.A. 429–32. Moreover, not even on appeal has the State argued that the stipulations do not establish the facts so stipulated.[6] Nevertheless, the dissent simply refuses to acknowledge the force of the stipulations. Instead it maintains that, despite the stipulations, we "[a]ssum[e]—without any record support or district court finding—that legislative delegations ... perform functions *beyond* those authorized by South Carolina state law as interpreted by the South Carolina Supreme Court." *Post* at 283.

■ Our dissenting colleague apparently believes that something more than a stipulation is required to prove the underlying stipulated facts.[7] But a stipulation, by definition, constitutes "[a]n express waiver made ... preparatory to trial by the party or his attorney conceding for the purposes of trial the truth of some alleged fact ... *the fact is thereafter to be taken for granted; so that the one party need offer no evidence to prove it and the other is not allowed to disprove it ....* It is, in truth, a substitute for evidence, in that it does away with the need for evidence." 9 Wigmore, Evidence § 2588, at 821 (Chad-

---

6. The dissent argues that reliance on the stipulations as to the powers presently exercised by the legislative delegations somehow constitutes "engaging in ... speculation about how legislative delegations conduct themselves." *Post* at 284. Tellingly, however, the defendants do not even suggest such a contention. Neither the State defendants nor the voters have ever disagreed over the powers the delegations presently exercise, suggested that the stipulations do not accurately set forth these powers, or challenged the stipulations. Thus, as the dissent notes, *post* at 284, the voters in their reply brief state that they do "not challenge any of the powers exercised by legislative delegations...." As the voters explained

in text omitted by the dissent, they do not challenge the delegations' powers "any more than the plaintiffs in *Reynolds v. Sims* challenged the powers of the Alabama legislature. What plaintiffs do challenge is the method by which county delegations are *elected.*" Reply Br. at 7–8.

7. Even if something more than a stipulation were necessary to prove that the delegations exercised governmental functions, the voters have produced such evidence. They offered uncontroverted testimony that, as noted within, *supra* at 277, the delegations regularly approve certain governmental budgets. *See* J.A. 264–65; 269–71.

burn 1981) (emphasis added). *See* 2 McCormack on Evidence § 254 (West 1992) (stipulations "have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact").

This court has had no difficulty in relying upon stipulations that a party engaged in a certain kind of activity, without requiring any additional "proof" as to the particulars of the underlying activity. *See, e.g., United States v. Clark,* 993 F.2d 402, 405–06 (4th Cir.1993) (Niemeyer, J.). And more than a century ago, the Supreme Court established that "[t]he power of the court to act in the disposition of a trial upon facts conceded by counsel is as plain as its power to act upon the evidence produced." *Oscanyan v. Arms Co.,* 103 U.S. 261, 263, 26 L.Ed. 539 (1880) ("any fact, bearing upon the issues involved, admitted by counsel, may be the ground of the court's procedure equally as if established by the clearest proof"). The dissent's theory, requiring something more than a stipulation, would appear to render not only our decision, but also that of the Supreme Court in *Oscanyan,* improper. Judicial authority does not, however, flow in that direction.

Moreover, even the dissent's determined disregard of the stipulated facts as to the numerous governmental functions exercised by the delegations cannot explain away the delegations' exercise of appointive powers, which even the state supreme court has held to be within the delegations' prerogative under state law. The dissent argues that the exercise of such powers does not constitute a governmental function. This is an extraordinarily odd contention. Consider, for example, a popularly

elected state official, whose sole function was that of appointing all of the judges in the state. Surely even the dissent would concede that the one person, one vote principle would govern the election of this official.

Yet the dissent, purportedly relying on the Supreme Court's opinion in *Sailors,* insists that the exercise of appointive powers does not constitute a governmental function. *Sailors* does not so hold.[8] In *Sailors,* the Supreme Court did hold the one person, one vote principle inapplicable to the selection of appointed county school board members. But, this holding did not rest on whether county school board members or those who appointed them exercised governmental powers; rather, *Sailors* turned on the fact that the challenged officials were *not* popularly elected. As the *Sailors* Court explained:

> If we assume *arguendo* that where a State provides for an election of a local official or agency—whether administrative, legislative, or judicial—the requirements of *Gray v. Sanders* [372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963)] and *Reynolds v. Sims* must be met, no question of that character is presented. For while there was an election here for the local school board, no constitutional complaint is raised respecting that election. Since the choice of members of the county school board did not involve an election and since none was required for these nonlegislative offices, the principle of "one man, one vote" has no relevancy.

*Sailors,* 387 U.S. at 111, 87 S.Ct. 1549.

The Supreme Court in *Sailors* thus expressly disavowed any reliance on the powers ("administrative, legislative, or judicial") of the challenged officials in holding

---

8. The dissent's misuse of *Sailors* rests on a false analogy. In *Sailors,* voters challenged the selection of county school board members who had been appointed by delegates chosen from popularly elected local school boards. In the case at hand, the voters challenge the selection of members of the legislative delegations, who, the dissent concedes, are popularly "elected rather than appointed." *Post* at

286. Rather than analogizing the popularly elected legislative delegation members to the popularly elected local school board members in *Sailors,* the dissent attempts to analogize them to the *delegates* who had been selected by the local school boards to appoint the county board. Indisputably, these delegates were *not* popularly elected.

that the one person, one vote principle did not apply. Indeed the Court *assumed* that whatever the challenged officials' powers, *Reynolds* would govern *if* the officials were popularly elected. Accordingly, *Sailors* provides no support for the dissent's theory that the one person, one vote requirement does not govern *popularly elected* officials exercising appointive powers.

Finally, we note that our holding does not, as the dissent posits, *post* at 285, "strike down as unconstitutional the existence" of the legislative delegations. We do not "strike down" the delegations any more than the Supreme Court struck down the Alabama state legislature in *Reynolds v. Sims*. The delegations continue to exist, and can lawfully exercise two-thirds of the powers that the dissent acknowledges to be theirs: the power to receive information and the power to make non-binding recommendations. Moreover, the delegations can continue to exercise all of the numerous powers they presently exercise, if they comply with the one person, one vote principle. That task is far from impossible; it certainly does not "leave[ ] South Carolina without any practical alternative." *Post* at 288. Though they would no longer be county-defined, the legislative delegations could be reorganized such that each delegation represented a cluster of legislative districts. Or the delegations could keep their current territorial configurations and adopt a system of weighted voting. Our holding thus does nothing to prohibit South Carolina, if it chooses, from continuing to utilize "subset[s] of the legislature" to perform a "structured buffer role." *Id.* at 288.

## VI.

In sum, we conclude that the legislative delegations are elected bodies that exercise governmental functions, and that therefore the one person, one vote requirement applies to them. Because there is no serious dispute that the delegation system fails to satisfy this requirement, we hold it to be unconstitutional.

We do not, however, dictate any remedy. As the Supreme Court noted in *Reynolds*, "legislative reapportionment is primarily a matter for legislative consideration and determination, and ... judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." 377 U.S. at 586, 84 S.Ct. 1362. We recognize that the district court held this case in abeyance for some time to permit the South Carolina legislature to reform the present structure of the county legislative delegation system, which the legislature unfortunately failed to do. In light of our decision here, however, the legislature may well be able to turn to the task with fresh resolve and should, as the parties agree, be given the opportunity to do so. We therefore remand the case to permit the South Carolina legislature to correct, subject to the approval of the district court, the constitutional defect in the delegation system that we have identified today.

The judgment of the district court is reversed and the case is remanded for further proceedings.

*REVERSED AND REMANDED*

NIEMEYER, Circuit Judge, dissenting:

Considering an entire state legislative mechanism in the abstract without any challenged conduct or legislative act, the majority strikes down as unconstitutional South Carolina's legislative delegation system. This heavy-handed intrusion into the heart of state government represents an unwarranted extension of federal judicial power, justified only by generalities and irrelevant history but certainly not by the U.S. Constitution.

In South Carolina, state legislators are elected in conformance with the one-person, one-vote principles announced in *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and the parties do not dispute this. Legislators so

elected are assigned by law to membership in county-based legislative delegations, each of which is composed of the legislators whose districts lie in whole or in part within that county. Thus, there are 46 legislative delegations, one for each county. Delegation membership is not a separate political office to which members are elected.

As I show below, under current state law as authoritatively construed by the state supreme court, legislative delegations in South Carolina can exercise no legislative or executive power. They function only (1) to receive information related to their members' duties as legislators in the General Assembly, (2) to make non-binding recommendations to governmental officials, and (3) to make appointments to local administrative positions. Even assuming that legislators making up these delegations represent different sized populations, none of these functions performed by the legislative delegations is sufficient to trigger the principles of *Reynolds*. On the contrary, each function has been authorized by existing Supreme Court case law to be performed by a body that does not meet one-person, one-vote scrutiny.

Without a rigorous examination of the specific functions of these legislative delegations, the majority simply sweeps the details under a broad and inaccurate generalization that *a priori* makes the delegations unconstitutional, concluding simply that legislative delegations are "elected bodies that exercise governmental functions," and therefore they must comply with the strictures of *Reynolds. Ante,* at 281. To justify its generalization, the majority relies on alleged *ultra vires* conduct or on historical functions of legislative delegations, reaching back into the nineteenth century to apply a gloss totally inconsistent with how they function today in compliance with state law.

The citizens of South Carolina can be genuinely and legitimately troubled by this awkward and unnecessary exercise of federal power. For the reasons discussed below, I dissent.

## I

To begin with, the majority has failed, in my view, to identify precisely what it is that we are called upon to review. While it sets out to evaluate the legislative delegation system as established by law, it considers claims of *ultra vires* conduct to ignore standing state supreme court case law and uses that conduct to strike down the entire system. But the plaintiffs in this case do not challenge any particular act of a legislative delegation, and thus, this is not a case in which we evaluate whether a governmental body acted within its power or not. Because the plaintiffs challenge the very existence and structure of the entire system, we must examine what legislative delegations are. To do so, we must look at how the delegations are constituted and what powers they are authorized to wield *under South Carolina law.* Only after we determine what the nature of these legislative delegations are under state law can we address whether, under federal law, they violate the Fourteenth Amendment to the U.S. Constitution.

While the majority is correct to point out that through much of this century, legislative delegations from each county were the primary form of local government in South Carolina,[1] this historical fact, without more, is not relevant to their current role. In 1973, the South Carolina Constitution was amended to provide for separately elected county governments, and in 1975, the South Carolina General Assembly passed the Home Rule Act,

---

1. For most of this time, legislative delegations were from districts entirely within a county. Legislative districts that crossed county lines were not mandated until the mid–1960s as a result of the Supreme Court's decision in

*Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), requiring state legislative districts to have a substantially equal voting population.

S.C.Code § 4–9–10, *et seq.*, which transferred most of the legislative delegations' powers to the new county governments. *See* S.C.Code § 4–9–30. Even before this legislatively-created power shift, however, the delegations had been losing power through a series of judicial constructions of the state constitution. In 1971, the South Carolina Supreme Court held that legislative delegations could not wield the power to approve or disapprove budgets, thus rendering unenforceable any statute that purported to grant such power. *See Gould v. Barton,* 256 S.C. 175, 181 S.E.2d 662, 674 (1971). The next year, the state supreme court went further, holding that *no legislative functions* may constitutionally be performed by the delegations. *See Gunter v. Blanton,* 259 S.C. 436, 192 S.E.2d 473, 475 (1972) (delegation members "may exercise legislative power only as members of the General Assembly"). In 1980, the state supreme court completed its redefinition of the once-powerful delegations, striking down a delegation's power to approve or disapprove tax increases, and holding that legislative delegations can never wield *any executive powers. See Aiken County Bd. of Educ. v. Knotts,* 274 S.C. 144, 262 S.E.2d 14, 17 (1980). Thus, under South Carolina law, legislative delegations may exercise neither legislative functions nor executive power, and the South Carolina courts have consistently policed these prohibitions. *See, e.g., Thomas v. Cooper River Park,* 322 S.C. 32, 471 S.E.2d 170, 171–72 (1996); *Tucker v. South Carolina Dep't of Highways,* 309 S.C. 395, 424 S.E.2d 468, 469 (1992) ("We have long held that legislative delegates may exercise legislative power only as members of the General Assembly enacting legislation [,and] [a]ction by a legislative delegation pursuant to a complete law [is executive] and is therefore constitutionally invalid").

Rather than accept the state's highest court's statement of what powers the legislative delegations possess and assume that the state complies with its law, the majority relies selectively on the parties' competing claims and conflicting characterizations of stipulations about what the state law is and how it is to be interpreted. Proceeding with the same lack of foundation in its analysis of state law, the majority maintains, "we must consider the powers presently *exercised* by the delegations without regard to whether those powers have been or would be ruled unconstitutional by the state supreme court." *Ante,* at 276. The majority then assumes that legislative delegations exercise power in violation of their own constitution and Supreme Court precedents because "nothing in the record suggests that the delegations have limited their activities in this manner." *Ante,* at 277. Assuming—without any record support or district court finding—that legislative delegations therefore perform functions *beyond* those authorized by South Carolina state law as interpreted by the South Carolina Supreme Court, the majority concludes that what the legislative delegations do amounts to "governmental functions" requiring one-person, one-vote scrutiny. Apart from the fact that no specific conduct is before us, whether *ultra vires* or not, the logic for the majority's conclusion is long lost in its posited hypotheticals and unfounded assumptions.

The majority makes much of a stipulation agreed to by some of the parties that county legislative delegations "perform numerous and various general county governmental functions," maintaining that this stipulation "would seem to resolve the question of whether the delegations perform governmental functions: the State has conceded that they do." *Ante,* at 275. The majority then concludes that this stipulation that legislative delegations do in fact perform governmental functions "presents an unanswerable obstacle to our dissenting colleague's theory." *Ante,* at 278. A closer look at the stipulation, however, reveals that the majority's entire analysis is built on a house of cards.

First, the South Carolina House of Representatives and the Speaker of the House,

a majority of the defendants in number, refused to stipulate to the characterization that the legislative delegations' powers were "governmental." *See* J.A. 184. Second, the stipulation is nothing more than a purported characterization of "functions prescribed by state law." Not only are these not facts on which to base a constitutional holding, they are not facts at all. They are purported summaries of state statutes agreed to by some of the parties. The statutes themselves, which are attached to the stipulation, best speak for what is authorized. Finally, even a review of the state statutes themselves cannot be the end of the analysis because the South Carolina Supreme Court has ruled that legislative delegations may not perform some of the functions authorized by these statutes. Thus, for example, while a review of these statutes would reveal that some legislative delegations can tax and set budgets, the Supreme Court of South Carolina has ruled that the legislative delegation may not exercise that power. *See Aiken County Bd.*, 262 S.E.2d at 17.

Thus, it becomes apparent that in relying on a stipulated characterization of state statutes, the majority rests on little more than hypothesis and assumption. By engaging in such speculation about how legislative delegations conduct themselves, the majority rejects the appellants' own limitations on the arguments they raise in this case. As the appellants stated in their brief:

> Defendants' argument that plaintiffs are challenging "the actions of legislative delegations," or "asking for an inquiry into 'how the legislature actually works in practice'" is factually incorrect and serves only to obscure the nature of plaintiffs' claims. Plaintiffs do not challenge any of the powers exercised by legislative delegations.

What is before us is the constitutionality of the legislative delegation system as established under South Carolina law.

A federal court reviewing the constitutionality of the system cannot, without particularized conduct at issue, reject the South Carolina courts' definition of the legislative delegation system. The South Carolina constitution, as interpreted by the South Carolina Supreme Court, allows legislative delegations only three "powers": (1) delegations can be granted the power to receive information relevant to the members' legislative duties in the General Assembly, *see Spartanburg County v. Miller*, 135 S.C. 348, 132 S.E. 673 (1924); (2) delegations can be granted the power to make non-binding recommendations, *see Tucker v. South Carolina Dep't of Highways*, 314 S.C. 131, 442 S.E.2d 171, 173 (1994); *Crow v. McAlpine*, 277 S.C. 240, 285 S.E.2d 355, 357 (1981); and (3) delegations can be granted the power to make appointments to local governmental offices, *see Tucker*, 442 S.E.2d at 172.

Once we are given the state-established scope of legislative delegations' powers, it then becomes our duty to determine whether this state governmental institution, possessing these defined powers, is subject to the one-person, one-vote requirement of federal law as elaborated in *Reynolds* and its progeny. The majority rejects this method of analysis, claiming that legislative delegations should be judged on powers that they purportedly *exercise* rather than on the powers that they *legally possess*. It argues that governmental action that violates a state constitution can also violate the federal constitution, citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Snowden v. Hughes*, 321 U.S. 1, 11, 64 S.Ct. 397, 88 L.Ed. 497 (1944); *Home Tel. & Tel. v. City of Los Angeles*, 227 U.S. 278, 287, 33 S.Ct. 312, 57 L.Ed. 510 (1913). While I fully agree with this principle, it is not applicable to the case before us because the plaintiffs challenge the entire system in the abstract rather than a particular, allegedly *ultra vires* act.

To take the majority's method a step further, when a court concludes that an *ultra vires* act of a state or local govern-

mental body is unconstitutional, it surely cannot use that finding as the basis for striking down the underlying governmental body. In short, striking down an *ultra vires* act does not authorize us to strike down as unconstitutional the existence of the body that performed the act. But since we have no particular *ultra vires* acts before us, the majority should have constrained itself to review legislative delegations as constituted under South Carolina law.

If we accept the South Carolina Supreme Court's pronouncements prohibiting legislative delegations from exercising legislative and executive powers and authorizing them only to receive information auxiliary to legislative duties, to make nonbinding recommendations, and to make appointments to local governmental offices, then we must determine whether any of these powers is sufficient to trigger one-person, one-vote scrutiny. This is the task at hand which the majority has refused to address.

## II

Analyzing the legislative delegations as they are constituted under state law, I find that the delegations do not wield any power that would subject them to the federal limitation of one person, one vote. While the majority cites *Hadley v. Junior College District*, 397 U.S. 50, 56, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970), for the proposition that any elected body performing "governmental functions" is subject to the one-person, one-vote requirement, Supreme Court precedent constrains us to interpret "governmental functions" to include only legislative and executive powers—the precise powers that the legislative delegations in South Carolina are not allowed to wield. None of the three powers that legislative delegations are authorized to exercise trigger one-person, one-vote analysis under Supreme Court precedent.

The legislative delegations' first power is the power to receive information relevant to the members' duties as legislators in the General Assembly. Because this authority can take the form of the power to conduct an audit of a county government, *see Miller*, 132 S.E. at 677, something that a private party would not be allowed to do, it could, in the broadest sense, be considered to be "governmental." The power to receive information incidental to a legislative function, however, is not a "governmental power" as that term is used in the context of the constitutional limitation of *Reynolds*. The Supreme Court has long recognized that the power to receive information, including the power to issue subpoenas and hold noncompliers in contempt, "is an essential and appropriate *auxiliary* to the legislative function," and so may be wielded outside the normal constitutional structure. *McGrain v. Daugherty*, 273 U.S. 135, 174, 47 S.Ct. 319, 71 L.Ed. 580 (1927) (emphasis added). The Court held that such auxiliary power may be constitutionally exercised by a single house of Congress. *See id.; see also Morrison v. Olson*, 487 U.S. 654, 694, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988). This is so, even though Congress may exercise legislative power only through the constitutionally prescribed manner of passage by both houses and presentment to the President, *see Clinton v. City of New York*, 524 U.S. 417, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998), and even though Congress may never exercise executive power, *see INS v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). Accordingly, the power to receive information incidental to a legislative function is not, in itself, legislative or executive, and it can be wielded in ways that "governmental powers" cannot. For example, it can be and often is wielded by a committee of Congress or of a state legislature, even though such committees do not contain representatives of all of the people in the jurisdiction. Just as a committee of a legislature can hold hearings and receive information without triggering one-person, one-vote scrutiny, a legislative delegation in South Carolina can receive information that is incidental to the mem-

bers' legislative roles in the General Assembly without triggering such scrutiny.

The legislative delegations' second power under South Carolina law is the power to make non-binding recommendations. This power, like the power to receive information, is one that the Supreme Court has allowed to be vested in a subset of the legislature—or even in specific members. *See Morrison*, 487 U.S. at 694, 108 S.Ct. 2597 (upholding the statutory power of certain Members of Congress to request that the Attorney General apply for the appointment of an independent counsel). Indeed, the power to make non-binding recommendations to governmental officials is a power that all Americans—those in and out of government—have as a constitutional right. *See* U.S. Const. amend. I (protecting "the right of the people ... to petition the Government for a redress of grievances"). Because this power is held by every individual, corporation, and public or private entity in this country, it cannot be considered a "governmental function" subject to one-person, one-vote scrutiny.

The final power that the legislative delegations may be granted is the power to make appointments to local administrative bodies, such as to positions on boards of education or transportation committees. This is the most substantive power of the legislative delegations, but substantive does not necessarily mean "governmental" in this context. The Supreme Court has specifically approved a body's exercise of this power without complying with one-person, one-vote principles. In *Sailors v. Board of Education*, 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967), a unanimous Supreme Court upheld Michigan's school board system whereby residents of various school districts *elected* local school boards, and those local school boards, through delegates, in turn *appointed* the county school boards. The challenge arose because each local school board, *regardless of the population it represented*, was given an equal vote in appointing the county school board. The plaintiffs' theory was that the resi-dents' equal protection rights were being violated because they had unequal power in the selection of county school boards. The Supreme Court rejected this challenge, holding that the county school boards were appointed, rather than elected, and as such, one-person, one-vote principles did not apply to them. The structure approved in *Sailors* is identical to that before us in that legislative delegations representing unequal populations in the counties select or appoint county officials.

The majority fails to appreciate *Sailors'* applicability in this context. The majority reasons that because members of the South Carolina legislative delegations are elected rather than appointed, *Sailors* does not apply. But that misses entirely the pertinence of *Sailors*. The South Carolina legislative delegations are not analogous to the appointed *county* school boards in *Sailors;* they are analogous to the *elected* local school boards in *Sailors*. Just as the elected local school boards appointed the county school boards in *Sailors*, the South Carolina legislative delegations appoint various governmental officials in South Carolina counties. In both cases, the appointing officials—members of the local school board appointing authority in Michigan and of the legislative delegations in South Carolina—were elected by districts of unequal populations. Nevertheless the Supreme Court held that one-person, one-vote principles have "no relevancy" to this scheme. *Sailors*, 387 U.S. at 111, 87 S.Ct. 1549. The distinction between *Sailors* and *Board of Estimate v. Morris*, 489 U.S. 688, 109 S.Ct. 1433, 103 L.Ed.2d 717 (1989), on which the majority so heavily relies, is that in *Sailors*, elected officials only appointed other public officials to carry out administrative and non-legislative functions, whereas in *Board of Estimate*, elected officials themselves served as a body constituted to exercise governmental functions. The holding of *Board of Estimate* is simply not apposite on the issue of whether appointment powers are governmental

functions restricted by one-person, one-vote principles.

In short, under *Sailors,* the appointment of local government officials is not a governmental function that can only be exercised by persons selected under one-person, one-vote principles. This is true even when, as in *Sailors,* the appointing body is directly or indirectly elected. As Justice Douglas wrote for the unanimous Supreme Court:

> Viable local governments may need many innovations, numerous combinations of old and new devices, great flexibility in municipal arrangements to meet changing urban conditions. We see nothing in the Constitution to prevent experimentation. At least as respects nonlegislative officers, a State can appoint local officials or elect them or combine the elective and appointive systems as was done here.

*Sailors,* 387 U.S. at 110–11, 87 S.Ct. 1549.

In summary, the power to receive information related to members' legislative duties is one that has long been delegated to legislative subsets that are not themselves imbued with legislative power and that are not equally representative of all voters. The Supreme Court has upheld this practice, necessitating the conclusion that the power to receive information may be placed in a subset of legislators even where that subset does not follow one-person, one-vote principles. Similarly, the power to make non-binding recommendations is not in any way a "governmental function," and thus it does not trigger one-person, one-vote scrutiny. Finally, the Supreme Court has explicitly upheld the placement of the appointment power in the hands of a body that, while elected, was not elected based upon one-person, one-vote principles. Because South Carolina's legislative delegations do not themselves exercise governmental functions as recognized by the Supreme Court, they need not meet the one-person, one-vote requirement, and therefore we have no authority to strike them down.

### III

In addition to their contention that the legislative delegations violate one-person, one-vote principles, the plaintiffs also claim that the legislative delegation system is racially discriminatory in violation of the Fifteenth Amendment, the Fourteenth Amendment, § 2 of the Voting Rights Act, and the Civil Rights Act. The majority's disposition of this case makes it unnecessary for it to reach these issues. But finding, as I do, that the legislative delegations are not subject to one-person, one-vote scrutiny, I would reach the plaintiffs' claims of racial discrimination.

I would first observe that the experts in this case do not agree, as the majority implies, that the legislative delegations were created in an effort to disenfranchise blacks. Professor William Moore of the College of Charleston stated that the emergence of the legislative delegations was principally the result of a design to put more power in the hands of the legislature as a check on the executive branch. Reducing the political power of blacks, according to Professor Moore, was essentially a non-issue in this development, although that pernicious goal had been the motivating force behind several earlier constitutional provisions, including a literacy test for voting and a requirement to pay poll taxes. Professor Orville Burton of the University of Illinois at Urbana–Champaign, on the other hand, offered a contrary conclusion. He opined that the legislative delegations were "in part established to disenfranchise and dilute the vote of African Americans." He stated that many historians, "understanding how complex and tangled underlying causes and specific effects become, nevertheless have linked the establishment of the county legislative delegation system with disfranchisement" of blacks.

Whichever of the experts is correct, however, is irrelevant to the delegations' current legal validity. The relevant facts

for this inquiry are whether the system is *maintained* for a discriminatory purpose or whether it has a discriminatory *effect*. An elective or appointive governmental system cannot violate the Fifteenth Amendment unless (at the very least) the system has been maintained for a discriminatory purpose.[2] *See Irby v. Virginia State Bd. of Elections*, 889 F.2d 1352, 1356 (4th Cir.1989). A system does not violate the Fourteenth Amendment unless it is true *both* that the system is maintained for a discriminatory purpose and that it has a discriminatory effect. *See id.* at 1355. A system does not violate § 2 of the Voting Rights Act unless it has a discriminatory effect. *See id.* at 1357. In short, if the court finds that the system is neither maintained for a discriminatory purpose nor that the system has a discriminatory effect, the plaintiffs cannot prevail under any of these theories.

The district court found, as a matter of fact, after a trial, that "[i]t simply cannot be said today that the legislative delegations are maintained for racially discriminatory purposes." With regard to the present effect of the legislative delegations, the court found "no present racially discriminatory effect in the legislative delegation system." On the contrary, the empirical data in the record suggests that the legislative delegation system actually enhances the relative power of black office-holders. As Professor Moore noted:

> If one examines electoral success of African-Americans in South Carolina, the highest percentage of seats held of any elected office by African-Americans is legislative seats. African-Americans also have a higher percentage of representation on legislative delegations than their White counterparts. For example, in the state house, African-American membership on legislative delegations averaged 1.54 delegations in 1995, compared to 1.49 for White legislators. In

the Senate, African-Americans on the average served on 3.3 legislative delegations compared to 2 for White senators. Thus, the legislative delegation system today actually enhances African-American representation on these bodies. J.A. 241–42. Because we cannot conclude that the district court's findings that the legislative delegation system is not maintained for a discriminatory purpose and does not have a discriminatory effect are clearly erroneous, the system cannot be invalidated under the Fourteenth Amendment, the Fifteenth Amendment, or the Voting Rights Act.

Finally, the plaintiffs' claim under the Civil Rights Act lacks support in both fact and law. The Civil Rights Act guarantees, in relevant part, that "[a]ll citizens of the United States who are otherwise qualified by law to vote ... shall be entitled and allowed to vote at all ... elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation ... to the contrary notwithstanding." 42 U.S.C. § 1971(a)(1). This law prevents persons from being denied the right to vote in any election on specified grounds. As this case has nothing to do with persons being denied the right to participate in the voting process, the Civil Rights Act is inapposite.

## IV

What is particularly troubling about the majority's opinion is that it leaves South Carolina without any practical alternative. South Carolina has sought to link its state and local governments by giving the state legislators a role, albeit a limited one, in local government and by giving local governments a specific access to the state legislature. This specialized relationship, providing almost a structured buffer role for the delegations, could not exist without the delegations because neither the General Assembly in its entirety nor the Gover-

---

2. It is not even clear that the Fifteenth Amendment applies in this context. *See Holder v. Hall,* 512 U.S. 874, 920, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994) (Thomas, J., concurring).

nor could perform that role. They are the object of the relationship not the buffer. Vesting these limited powers in a subset of the legislature has a rational purpose in providing a link between the state legislature and local governments, and we are not in any position to second guess this judgment made by South Carolina unless it is unconstitutional.

It is, of course, impossible for South Carolina to draw its legislative districts such that none cross county lines. That impossibility is the legacy of *Reynolds,* which found that the very Senate that gives equal voice to unequally populated states, such as New York and Vermont, nonetheless passed a constitutional amendment that forbids South Carolina from giving equal voice, in one of two legislative chambers, to Fairfield County and Greenville County. *See Reynolds,* 377 U.S. at 571–77, 84 S.Ct. 1362 (discussing the similarities between the United States system, granting equal vote to each state in the Senate and apportioning seats in the House of Representatives to states based upon population, and the Alabama system, which granted equal vote to each county in the upper house of the legislature and apportioned seats in the lower house of the legislature to counties based upon population, but nevertheless striking down the system of apportionment for *both* Alabama houses). But the requirements of *Reynolds* do not require us now to take further steps, and today's decision oversteps even the line set by the Supreme Court in *Sailors.*

Because *Reynolds* makes it impossible for a state to draw its legislative districts without crossing county lines, the only way in which South Carolina can preserve the legislative delegations against a one-person, one-vote challenge would be to assign the delegations only such powers as would not trigger one-person, one-vote scrutiny. Yet, the majority has failed to elucidate any law or principle that would allow the South Carolina General Assembly to determine that role because it classifies every

non-private activity as a prohibited "governmental function" and fails to respect the limits the South Carolina Supreme Court has already placed on the delegations. Thus, while the majority encourages the General Assembly to "turn to the task with fresh resolve" of implementing the majority's vision of good government, it leaves no way for the General Assembly to preserve the legislative delegation system. Although it is unwilling to say so, the majority has handed down a death sentence for legislative delegations in South Carolina, a sentence with which I vigorously disagree.