842 A.2d 790

Herbert McMILLAN et al.

v.

Delegate Mary Ann LOVE.

No. 116, Sept. Term, 2002.

Court of Appeals of Maryland.

Feb. 17, 2004.

---

552

John R. Greiber, Jr. (Phillip F. Scheibe, Glen Burnie), for appellants.

Robert A. Zarnoch, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Kathryn M. Rowe, Asst. Atty. Gen., on brief), Annapolis, for appellee.

Argued beford BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, LAWRENCE F. RODOWSKY (Retired, specially assigned), JJ.

BELL, C.J.

In this case, we are asked to determine whether a county delegation consisting of publicly-elected members of the Maryland General Assembly House of Delegates performs governmental functions sufficient to trigger the one-person/one-vote requirement of the 14th Amendment to the United States Constitution.

## I.

The relevant facts of this case are undisputed. County delegations,[1] consisting of members of the General Assembly

---

1. The delegations are required to consist of a minimum of three (3) members. Under House of Delegates Rule 19(a), if a delegation consists of less than three members, the Speaker may appoint additional members from other counties.

whose districts lie within, or partially within, one of Maryland's counties, play an important role in the enactment of local legislation. House of Delegates Rule 19A provides that, during the 90–day legislative session, which begins each January, county delegations serve as "select committees" with responsibility for considering bills and resolutions of a strictly local nature or which amend a particular Code of Public Local Laws and have no statewide implications. The delegations also lobby for funds and recommend individuals for certain civic boards and committees.[2]

The House of Delegates Rule 19A prescribes the voting rights of the state delegations. It provides, in relevant part:

"(b)(1) Except as provided by paragraph (2) of this subsection, each delegate who represents any portion of a county has one vote in the county delegation in which the district lies.

"(2) After an opportunity for all delegates to be heard, a majority of delegation members present and voting may elect to allocate nonresident delegates less than one full vote. The vote may not be less than one-third of a vote."

Rule 19A, thus, is the default rule and requires that, unless the Delegation votes otherwise with respect to nonresident Delegation members, all Delegation members are entitled to one vote each.

The Anne Arundel Delegation has enacted rules to govern its actions. Delegation Rule 3 governs the allocation of votes to each delegation member. When this controversy arose, the Anne Arundel County Delegation consisted of 12 members who represented the 6 districts of which the County was comprised. Three of the members of the delegation were from District 21, the boundaries of which are within both Anne Arundel County and Prince George's County. Because only a small portion of District 21 is in Anne Arundel County, those

---

**2.** The Delegation recommends appointments to community colleges, boards of trustees, liquor boards, special citizens boards and the county board of election supervisors. They also lobby for funds for police and educational and recreational facilities.

Delegation members represented significantly fewer citizens than did the delegates representing districts entirely, or more substantially, within the County's borders.[3]  On April 5, 2002, by a majority vote of the Anne Arundel County Delegation, the 21st District representatives were allotted one-third of a vote each.  After the April 5, 2002 vote, Rule 3 read:

"3.  *Voting*—Subject to the limitations herein, all members are eligible to vote on any and all issues brought before the Delegation unless, under the rules of the House, a member excuses himself or herself.  Each member who represents a legislative district completely within the boundaries of Anne Arundel County is entitled to one vote.  Of this group, only members who are present may vote.  Members who represent a legislative district which is not completely within the boundaries of Anne Arundel County form a group and are collectively entitled to one vote.  This vote may be cast by any one of the district's members who is present at a meeting.  The Chairman shall vote on all issues brought before the delegation."

With this vote allocation, the delegation was majority Democrat.

In November, 2002, petitioners Herbert McMillan and Donald Dwyer, both members of the Republican party, were elected to the Maryland House of Delegates, to represent districts within Anne Arundel County.  The petitioners replaced two Democrats and, thus, with their election, given the rules in effect with respect to the vote allocation in the Anne Arundel County Delegation, the Delegation would be majority Republican.

On December 2, 2002, after the General Assembly election results were certified, but before the start of the 2003 legislative session, when the newly elected members would be sworn, the Delegation, as it was then constituted, including the outgo-

---

**3.**  Compare District 21, representing 24,227 people with District 30, representing 117,102 residents, District 31 representing 115, 256 residents, District 32, representing 118, 319 residents, District 33A, representing 76,116 residents. and District B representing 38,636 residents.

ing members of the Delegation and excluding the newly elected members, met and amended Delegation Rule 3. By that amendment, each delegation member, including the delegation members from District 21, was allocated one vote, which assured that the Democrats retained the majority in the Delegation. The newly elected members of the General Assembly and future Delegation members protested their exclusion from this Delegation meeting and vote.

On January 3, 2003, the petitioners filed in the Circuit Court for Anne Arundel County a Verified Complaint for Declaratory and Injunctive Relief under 42 U.S.C. § 1983 [4] against the Chair of the Anne Arundel County Delegation, respondent, Delegate Mary Ann Love. They alleged that the amendment of Delegation Rule 3 with respect to the allocation of the vote among the members of the Delegation was intended "to preserve democratic control and leadership of the delegation," (petitioner's application for writ of certiorari in No. 116 at 5), and "to dilute [the petitioners'] votes in violation of the Equal Protection Clause guaranteeing one person one vote mandated by the Supreme Court of the United States." (petitioner's application for writ of certiorari in No. 116 at 5). The respondent filed a Motion to Dismiss/Opposition to Request for Preliminary Injunction, arguing that, pursuant to *Vander Linden v. Hodges*, 193 F.3d 268 (4th Cir.1999) and *DeJulio v. Georgia*, 290 F.3d 1291 (11th Cir.2002), the Delegation's activities were not substantial enough to constitute governmental functions and, therefore, did not trigger the protection afforded by the one-person/one-vote standard.[5]

---

**4.** 42 U.S.C. § 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

**5.** The 14th Amendment of the United States Constitution reads in pertinent part:

Following an expedited hearing and, relying on *Vander Linden* and *DeJulio*, the Circuit Court issued a ruling from the bench, granting the respondent's Motion to Dismiss. The court reasoned that the County Delegation did not exercise either "general" governmental powers, or "final" legislative power so as to require apportionment consistent with the Constitutional one-person/one-vote requirement of the 14th Amendment.[6] The petitioners noted an appeal to the Court of

---

"Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

"Section 2. Representatives shall be apportioned among the several states according to their respective numbers, counting the whole number of persons in each state, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the executive and judicial officers of a state, or the members of the legislature thereof, is denied to any of the male inhabitants of such state, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such state."

6. In the Circuit Court, the respondent included in her Motion to Dismiss and Answer to the Preliminary Injunction the following procedural and jurisdictional arguments for dismissing the petitioners' action: the suit was mooted by the House's subsequent adoption of Rule 19A; because only Delegate Love was sued, the suit lacked necessary parties; the injunctive relief was not justiciable as a "political question;" the respondent was protected by legislative immunity; and there was no basis for the granting of a preliminary injunction. She argues that, by incorporating her memorandum of law into his opinion, the trial judge implicitly adopted these other reasons as bases for the dismissal. The respondent persists in her reliance on these non substantive arguments and offers one additional one, that the petitioners did not file a notice of appeal from the final order of the Circuit Court. She explains:

"On January 21st, the Petitioners noted an appeal to the Court of Special Appeals. Later that day, the Judge signed an order dismissing the action, which was filed January 22nd. It would appear that [petitioners] did not file a new notice of appeal after entry of the

Special Appeals and, simultaneously, filed in this Court a petition for the issuance of the writ of certiorari. The petition presented a single question:

> "Did the Circuit Court err in determining a County delegation does not perform governmental functions that invoked the Fourteenth Amendment's principle of one person one vote?"

We granted the petition before there were proceedings in the Court of Special Appeals, *see McMillan v. Love*, 372 Md. 763, 816 A.2d 111 (2003), and set the case in for argument on an expedited basis. Following argument, the Court issued an order affirming the judgment of the Circuit Court, with the reasons to be set forth in an opinion to follow. We now give our reasons.

In the case *sub judice*, the petitioners argue that the actions of the county delegation violated their equal protection rights guaranteed by the one-person/one-vote requirement and the 14th Amendment to the United States Constitution. This is so, they say, because the County Delegation does perform significant governmental functions. In particular, the petitioners assert:

> "[T]he err[or] in the circuit court's view of a county delegation is its failure to recognize that local legislation bills may

---

order on January 22nd. However, after their payment of filing fees, the Clerk of Court apparently redocketed the previously filed notice of appeal on February 3, 2003."

We address this prematurity argument, since it is jurisdictional. Maryland Rule 8–602(d) provides:

"(d) Judgment entered after notice filed. A notice of appeal filed after the announcement or signing by the trial court of a ruling, decision or order, or judgment but before entry of the ruling, decision, order, or judgment on the docket shall be treated as filed on the same day as, but after, the entry on the docket."

The petitioners noted their appeal a day before the final Order of dismissal was filed, but after the court had announced the judgment in open court and signed a "HEARING SHEET ... AS ORDER OF COURT." Pursuant to Maryland Rule 8–602(d), we shall treat the petitioner's notice of appeal "as filed on the same day as, but after, the entry on the docket," of the judgment. *Md. Rule 8–602(d)*.

We shall assume, but not decide, that the other issues raised by the respondent should be resolved favorably to the petitioners.

never be voted upon unless they are favorably viewed by the delegation and sent to the floor by the delegation. Thus, the importance of controlling the County delegation by political fiat and manipulation, i.e., the party which controls the chair controls local matters, clearly a governmental function. For if otherwise, there is much to do about nothing in this case. The above notwithstanding, one might question, as did the [petitioners] in this matter, why the County Executive and the Council visit the County delegation and present what is referred to as their 'wish list.' Again a demonstration of the governmental function served by the delegation in the form of controlling the agenda and calendar of bills and their introduction or failure of introduction on the floor for what is nothing more than a stamp of approval by the entire house on a local law."

They point out, in addition, that the recommendations of county delegations and their members are sought with respect to appointments to, among others, community college boards of trustees, liquor boards, special citizens boards, the county board of election supervisors and the county board of education, some of which are state agencies and/or receive state funds. County boards, moreover, they note, also lobby for funds for police and educational and recreational facilities. Although conceding that the delegations in the General Assembly "may not be embodied with the enormous powers of those exercised in *Vander Linden,*" the petitioners emphasize that the court in *Vander Linden* acknowledged that less extensive governmental functions could trigger the one person, one vote rule. As a result, because the District 21 members represent a markedly smaller population than the other county districts, giving them a full vote does not reflect the requirement of proportionate representation required by the 14th Amendment.

The respondent urges the Court to affirm the judgment of the Circuit Court. She denies that the delegation's activities constitute "governmental functions," which trigger the protection of the one-person/one-vote standard. Although acknowledging that "[t]hrough the doctrine of 'local courtesy,' [local legislation is] ordinarily approved by the full General Assem-

bly," the respondent points out that "this is not invariably true":

"in 2001, of the 7 bills sponsored by the Anne Arundel Delegation only 3 passed. In 2002, of 10 Delegation bills, only 4 passed.... Seven of those 17 bills were State bond bills, which are public general measures, not local legislation.... A major reason for this dearth of bills is that Anne Arundel is a charter home rule county where the County Council enacts local laws."

She also notes that "[l]egislation approved by a county delegation typically is also considered by standing committees and must be approved by both Houses."

## II.

### One–Vote

■ This Court has consistently enunciated the rule that "the Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." *In re Legislative Districting of the State,* 370 Md. 312, 379, 805 A.2d 292, 332 n. 38 (2002) (quoting *Reynolds v. Sims,* 377 U.S. 533, 577, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506, 546 (1964)); *DuBois v. College Park,* 286 Md. 677, 684–85, 410 A.2d 577, 582–83 (1980). The Supreme Court, in *Hadley v. Junior College Dist. Of Metro. Kansas City,* 397 U.S. 50, 54, 90 S.Ct. 791, 794, 25 L.Ed.2d 45, 50 (1970), enunciated the rationale for apportioning legislative bodies based upon the general population, when it stated:

"the right to vote in an election is protected by the United States Constitution against dilution or debasement. While the particular offices involved in these cases have varied, in each case a constant factor is the decision of the government to have citizens participate individually by ballot in the selection of certain people who carry out governmental functions."

*Id.*

■ Further, the one-person/one-vote requirement of the Fourteenth Amendment extends to local government and im-

poses the same standard of proportionality to local government officials. *See Montgomery County Council v. Garrott,* 243 Md. 634, 639, 222 A.2d 164, 165 (1966). *See also DuBois v. College Park,* 293 Md. at 680, 447 A.2d at 840 (holding that the one-person/one-vote standard "extend[s] to elected local government units exercising substantial governmental authority"). To that end, the Supreme Court has held that

> "whenever a state or local government decides to select persons by popular election to perform governmental functions, the Equal Protection Clause of the Fourteenth Amendment requires that each qualified voter must be given an equal opportunity to participate in that election, and when members of an elected body are chosen from separate districts, each district must be established on a basis that will insure, as far as practicable, that equal numbers of voters can vote for proportionally equal numbers of officials."

*Hadley v. Junior College Dist. of Metro. Kansas City,* 397 U.S. at 54, 90 S.Ct. at 794, 25 L.Ed.2d at 50–51 (1970).

■ Therefore, under the rationale enumerated by this Court and the Supreme Court in *Hadley,* the touchstone for determining whether local government officials are subject to the one-person/one-vote requirement turns on two distinct factors: 1) that the governmental official was popularly elected; and 2) that the government official performed "governmental functions." *Id.,* 397 U.S. at 56, 90 S.Ct. at 795, 25 L.Ed.2d at 51; *Vander Linden v. Hodges,* 193 F.3d 268, 273 (4th Cir.1999). *See also DeJulio v. Georgia,* 290 F.3d 1291, 1295 (11th Cir.2002).

There is no dispute that the members of the Anne Arundel County delegation are popularly elected, each member of the delegation was elected to the Maryland General Assembly in the 2002 statewide general election by the applicable voters. We are, therefore, left to consider only whether the actions of the Anne Arundel County delegation constitute "governmental functions."

This Court has not had occasion to consider the issue of whether the actions of county delegations constitute "governmental functions." That issue has been addressed by the 4th and 11th Circuit Courts of Appeal, however.

In *Vander Linden v. Hodges, supra,* individuals elected to the South Carolina State legislature, constituted the local delegation for the county from which they were elected. Originally, the boundaries for each South Carolina district existed completely within one of South Carolina's counties. 193 F.3d 268 at 271. After the Supreme Court enunciated the "one-person/one-vote" rule in *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the South Carolina legislative districts were re-drawn producing legislative districts that sometimes crossed county lines. *Id.* As a result, legislators were often elected to represent constituents in multiple counties and those legislators automatically became members of any local delegation for any county which lay partially within their districts. *Id.* Under South Carolina law, the members of the county delegations had one vote for any delegation decision regardless of the number of constituents the legislator represented within the relevant county. *Id.*

The plaintiffs, South Carolina voters, filed suit against the Governor of South Carolina, the South Carolina legislature, the Speaker of the House and other state officials, alleging that the South Carolina county delegation voting system, *inter alia,* diluted the voting power of South Carolina voters from more populous areas. *Id.,* 193 F.3d at 272. Specifically, the petitioners maintained that the allocation of one vote to each member of the delegation without regard to the number of residents in each district rendered their votes less effective and violated the one-person/one-vote requirement of the 14th Amendment, the Voting Rights Act of 1965 and the Civil Rights Act of 1957. *Id.* The District Court rejected the voters' claims.

Relying, in part, on *Sailors v. Board of Educ.,* 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967) (holding that the one-person/one-vote requirement did not apply to an appointed

county school board), the District Court held that the members of the South Carolina county delegations were appointed, and not popularly elected,[7] 193 F.3d at 273, and that the delegation voting scheme was not constitutionally deficient.

The 4th Circuit Court of Appeals reversed. *Vander Linden,* 193 F.3d at 281. The court first held that the District Court erred in its determination that the South Carolina county delegation members were not popularly elected. *Id.* at 274. In so determining, the court relied on the Supreme Court's holding in *Board of Estimate v. Morris,* 489 U.S. 688, 694, 109 S.Ct. 1433, 1438, 103 L.Ed.2d 717, 727 (1989) (holding that members of a New York Board of Estimates who are not independently elected to the Board of Estimates but who "become members [of the Board] as a matter of law upon their various elections ... constituted a popularly elected body to which the one person, one vote requirement applied").

Having determined that the South Carolina delegations were popularly elected, the *Vander Linden* court turned to the question of whether the South Carolina delegation performed sufficient governmental functions to trigger the one-person/one-vote requirement of the 14th Amendment. It noted, in that regard, that the South Carolina delegations "played a critical role in the governance of [the state] counties for more than a century ...," *id.* at 270, and that, " '... for generations legislative delegations of the General Assembly controlled virtually every aspect of local government.' " *Id.* (citation omitted). The Court held that, in light of the numerous "fiscal, regulatory and appointive functions," *id.* at 277, assigned to the county delegation, it clearly performed governmental functions to which the one-person/one-vote requirement of the 14th Amendment applied. *Id.* Particularly, the court pointed out that the South Carolina delegation was

---

7.  The District Court found that, because legislators automatically became members of the county delegations upon their elections to the South Carolina State Legislature, they were not "popularly elected" as required to invoke the protection of the one-person/one-vote rule. *Vander Linden v. Hodges,* 193 F.3d 268, 273 (4th Cir.1999).

statutorily empowered to perform a great many fiscal and regulatory functions, including, *inter alia:*

"(a) making and/or recommending appointments to boards and commissions;

"(b) approving and/or recommending the expenditure of money allocated by the South Carolina General Assembly for highways, parks, recreation, tourism, and other matters;

"(c) approving the budgets of local school districts;

"(d) initiating referenda regarding the budgetary powers and the election of governing bodies for a special purpose in public service districts;

"(e) approving the reimbursement of expenses for county planning commissioners;

"(f) approving county planning commission contracts with architects, engineers, and other consultants;

"(g) altering or dividing school districts of counties;

"(h) reducing existing special school levies in counties and school districts;

"(i) submitting grant applications for planning, development and renovating park and recreation facilities."

*Id.* at 276–77.[8]

With regard to these numerous governmental functions, the court concluded: "Given the array of state statutes empowering the delegations to perform fiscal, regulatory, and appointive functions and the parties' stipulation that the delegations do 'perform' such functions, we have little difficulty concluding that the legislative delegations exercise 'governmental functions' " *Id.* at 277–278.

*Vander Linden* comports with the Supreme Court holding in *Hadley, supra,* that when popularly-elected state district representatives "perform important governmental functions within the districts and ... these powers are general enough and have a sufficient impact throughout the district," *id.* 397

---

8. The state stipulated that the county delegation performed these functions.

U.S. at 53–54, 90 S.Ct. at 794, 25 L.Ed.2d at 49 "qualified voter[s] . . . ha[ve] a constitutional right to have [their] vote[s] counted with substantially the same weight as that of any other voter. . . ." *Id.* 397 U.S. at 53, 90 S.Ct. at 793, 25 L.Ed.2d at 49.

In *Hadley,* the appellants, residents and taxpayers of the Kansas City School District filed suit seeking a declaratory judgment that the statutory formula for electing the state Junior College Board of Trustees diluted the voting power of the residents of more populous school districts in violation of the 14th Amendment and the one-person/one-vote standard. *Id.* 397 U.S. at 51–52, 90 S.Ct. at 793, 25 L.Ed.2d at 48. The appellants collectively represented one of eight school districts that comprised the "Junior College District of Metropolitan Kansas," *id.* 397 U.S. at 51, 90 S.Ct. at 792, 25 L.Ed.2d at 48, the trustees of which were to be elected based upon the apportionment "among the separate school districts on the basis of 'school enumeration' defined as the number of persons between the ages of six and 20 years, who reside in each district." *Id.* 397 U.S. at 51, 90 S.Ct. at 793, 25 L.Ed.2d at 48 (citing Mo.Rev.Stat. §§ 178.800, 178.820 (Cum.Supp.1967)). Based on this statutory voting scheme, in light of the population estimates, three trustees, or 50% of the board of trustees were elected to represent approximately 60% of the residents. This plan, argued the appellants, diluted their voting power in violation of the Equal Protection Clause. *Id.* 397 U.S. at 52, 90 S.Ct. at 793, 25 L.Ed.2d at 49.

The Supreme Court of Missouri upheld the trial court's dismissal of the case, reasoning that the Junior College Board of Trustees was not a " . . . unit of local government having general governmental powers over the entire geographic area served by the body." *Hadley v. Junior College Dist.,* 432 S.W.2d 328, 334 (Mo.1968) (citing *Avery v. Midland County,* 390 U.S. 474, 483, 88 S.Ct. 1114, 1119, 20 L.Ed.2d 45, 53 (1968)). Further, the Missouri Supreme Court distinguished the purpose of the Board of Trustees from that of other popularly-elected "municipal corporations" holding that the Junior College Board of Trustees was an "instrumentality of

the state created for one special purpose and with one single function—education." *Id.* at 333. Therefore, held the court, it was "doubtful" that the one-person/one-vote standard applied. *Id.*

The Supreme Court did not agree. Holding that the Missouri statutory voting scheme violated the one-person/one-vote rule in violation of the plaintiff/appellants rights under the 14th Amendment, it reversed. *Id.,* 397 U.S. at 52, 90 S.Ct. at 793. 25 L.Ed.2d at 48. Specifically, its holding was

> "[A]s a general rule, whenever a state or local government decides to select persons by popular election to perform governmental functions, the Equal Protection Clause of the Fourteenth Amendment requires that each qualified voter must be given an equal opportunity to participate in that election, and when members of an elected body are chosen from separate districts, each district must be established on a basis that will insure, as far as practicable that equal numbers of voters can vote for proportionally equal numbers of officials."

*Id.* at 56, 90 S.Ct. at 795, 25 L.Ed.2d at 50. In so holding, it rejected the determination that the Junior College Trustees constituted a board elected for the single "special purpose" of education and, thus, was not required, under the one-person/one-vote standard, to reflect demographic proportionality. *Id.* 397 U.S. at 54, 90 S.Ct. at 795, 25 L.Ed.2d at 50. It explained that in that case, the trustees were popularly elected, *id.* at 56, 90 S.Ct. at 795, 25 L.Ed.2d at 50–51, and that the popularly-elected junior college trustees performed sufficient governmental functions to invoke one-person/one-vote protection: they were given extensive responsibilities over the operation of a state junior college, i.e. the trustees were empowered to "levy and collect taxes, issue bonds, hire and fire teachers, make contracts, collect fees, supervise and discipline students, pass on petitions to annex school districts, acquire property by condemnation, and in general manage the operations of the junior college." *Id.* This laundry list of responsibilities delegated to the college trustees, the Court observed, "show that the [board of] trustees perform important govern-

mental functions within the districts ... and have sufficient impact ..." to require its compliance under the one-person/one-vote standard of the 14th Amendment. *Id.* 397 U.S. at 54, 90 S.Ct. 791 at 794, 25 L.Ed.2d at 45.

On the other hand, in *DeJulio v. Georgia, supra,* 290 F.3d 1291, a case factually similar to the case at bar, Plaintiff voters filed suit under 42 U.S.C. § 1983 against the State and the Governor of Georgia, in his official capacity, alleging *inter alia,* that the process for enacting local legislation violated the one-person/one-vote standard. *Id.* at 1294. Relying on the reasoning in *Vander Linden,* the Plaintiffs argued that the Georgia county delegations performed such substantial governmental functions and have such a significant impact as to require proportional representation.

In *DeJulio,* the Georgia delegations were primarily responsible for recommending and referring legislation that impacted upon their respective localities. *Id.,* 290 F.3d at 1293–94. The delegations referred bills affecting local matters to standing committees in the Georgia House and Senate, which, in turn, presented them to the legislative body for discussion and vote. These local bills usually received "local courtesy", *id.,* and, as long as the local legislation received the requisite number of votes from members of the county delegation, the Georgia Legislature normally passed the legislation without contest on the rationale that the local delegation possessed superior judgment about purely local matters. *Id.* The ultimate decision, however, to contest, deny, or approve any legislation referred or recommended by a county delegation was within the exclusive power of the General Assembly.

The Court of Appeals for the 11th Circuit held that the referral of local legislation was not a governmental function, the decision whether to enact the proposed bills being exclusively within the power of the state legislature, whose members were elected in accord with the one-person/one-vote standard. *Id.* at 1296. While acknowledging that most bills referred by the delegations were approved without contest as a "local courtesy," *id.,* the court observed that the approval

was neither codified, nor required "... the discretionary deference to local courtesy when either the House or Senate addressed local legislation." *Id.*

The *DeJulio* court distinguished the powers of the Georgia delegations from those in *Vander Linden:*

" 'A reading of the statutes at issue in *Vander Linden* shows that South Carolina's local legislative delegations performed local governmental functions either in lieu of or in concert with local governments, depending on the situation. The statutes the Fourth Circuit cited in *Vander Linden* do not limit the role of South Carolina's local legislative delegations to consideration of local legislation. They instead broadly define the role of South Carolina's local legislative delegations in overseeing and approving local government's general activities. Indeed most of these statutes explicitly provide that the local legislative delegation, not the entire General Assembly, is the final authority.

"In contrast, no final governmental authority is granted to the Georgia General Assembly's local delegations. The Georgia Constitution explicitly provides that the General Assembly *as a whole,* not specific local delegations, is the legislative authority for Georgia's counties and municipalities.' "

*Id.* at 1296 quoting *DeJulio v. Georgia,* 127 F.Supp.2d 1274, 1296–97 (N.D.Ga.2001).

■ The petitioners argue that, under *Vander Linden,* this court should interpret the legislative functions of the Anne Arundel county delegation as sufficiently governmental to require the application of the one-person/one-vote standard. In addition to referring local bills, the petitioners point out that the delegation recommends appointments for certain civic boards and committees and lobbies for funds. They concede, as we have seen, that these activities do not rise to the level of involvement at which the South Carolina county delegations engaged in such activities. Nevertheless, the petitioners point out that the *Vander Linden* court did not enunciate a bright line test for determining what constitutes sufficient govern-

mental action. In the absence of such a test, they maintain, this Court may conclude that the Anne Arundel County Delegation performed sufficient governmental functions to invoke the one-person/one-vote standard even though the level of its activities are not identical to, or as extensive as those in which the South Carolina county delegation was engaged or performed. The petitioners submit that the responsibilities allocated to the Anne Arundel County delegation meet the threshold of governmental function and significant impact and that this Court should so hold.

■ The juxtaposition of *Vander Linden* and *DeJulio* is instructive. It instructs that it is only when a county delegation is invested with great power over local county affairs that it will be determined to have engaged in governmental functions to the extent that proportionate representation is required, *Vander Linden*, 193 F.3d at 285–86; being empowered only to refer or recommend simply does not suffice. *DeJulio*, 290 F.3d at 1296.

To be sure, *Vander Linden* does not enumerate a bright line test for when the duties of a county delegation will amount to governmental action and this Court is not constrained to apply the facts of that case strictly to the circumstances *sub judice*. It is instructive, we think, not only to consider the number of governmental activities the Anne Arundel County delegation performs but to consider whether by performing those duties, it exercises sufficient control over local governance as to constitute "governmental functions".

As stated above, the rationale for requiring the one-person/one-vote standard is to ensure that voters are proportionately represented and that their interests are adequately considered by the Legislature. If not for the one-person/one-vote requirement, districts could be drawn in such a fashion that the interests of the few would wield equal, if not greater, strength than those of the rest of the population. Therefore, to determine whether the power of the Anne Arundel County delegation meets the threshold for one-person/one-vote, we

must inquire whether their power and actions "are general enough and have sufficient impact" on the residents.

The primary function of the Anne Arundel County delegation is to *refer* and *review* legislation of local impact and *recommend* individuals for local boards and committees. Like *DeJulio*, the bills referred by the local delegation go to a standing committee within the General Assembly, which in turn, presents the bill for consideration before the legislative body. The petitioners contend that this referral power is substantial because it is through this exclusive referral process that bills affecting the county reach, or do not reach, the General Assembly agenda.

In both, *Vander Linden* and *Hadley*, the governmental functions included statutorily authorized final legislative action. More importantly, the county delegation in *Vander Linden* and the Board of Trustees in *Hadley* were authorized to oversee and make independent decisions about numerous matters that directly impacted local life. This active role created the "substantial impact" on the local communities required by *Hadley* to invoke the one-person/one-vote requirement. Conversely, the only stated role of the Anne Arundel County delegation is to refer and recommend. In the form of the local delegation, the group does not directly control any aspect of local life. While it does control, to some extent, what legislation it refers to the General Assembly, by its own admission, the delegation is not the exclusive method for presenting local laws within the General Assembly. Accordingly, the actions of the delegation do not meet the threshold to invoke the one-person/one-vote standard required by the 14th Amendment.